**Patent is IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LIFESCIENCE TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:21-cv-01279-SEP |
| | ) | |
| v. | ) | |
| | ) | |
| MERCY HEALTH, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**MERCY'S OPPOSITION TO LST'S MOTION TO**
**EXCLUDE EXPERT TESTIMONY OF JONATHAN PEARCE**

Jonathan Pearce has worked in telemedicine and medical software for over twenty years, with experience in "software design, development, engineering, programming, procurement, management, and venture financing," ECF No. 367-1, Feb. 26, 2024 Expert Report of Jonathan Pearce ("Pearce Report"), ¶ 4, including (among other experience) founding and building his own successful telemedicine platform. *Id.* at ¶ 8. Relying on his extensive and highly relevant experience, Mr. Pearce offers opinions regarding a wide range of issues including, for example, what features and functions and alleged "secrets" were known and/or ascertainable in the relevant industry, an analysis of Myia's purported use of the alleged "secrets," that the alleged "secrets" and LST software lack competitive value, and flaws in the methodology and conclusions of LST's technical expert. *See generally* ECF Nos. 367-1, Pearce Report; 367-2, Supplemental Expert Report of Jonathan Pearce ("Supp. Pearce Report").

Notably, LST does not challenge Mr. Pearce's qualifications as an expert on the issues in this case, nor does LST seek to exclude Mr. Pearce's opinions that: LST's alleged secrets were generally known in the industry, Myia did not copy LST's software, Myia did not save any time as a result of any alleged access or copying, certain features were not present in LST's software,

or Mr. Ulrich's analysis on these same issues was flawed and unreliable.

Instead, LST mischaracterizes Mr. Pearce's reports and testimony, cites to and relies on inapposite law while ignoring trade secrets cases, and makes vague and sweeping claims regarding Mr. Pearce's testimony without adequately specifying particular opinions it seeks to exclude. LST's Motion to Exclude Expert Testimony of Jonathan Pearce should be denied.

## I. Mr. Pearce Does Not Offer Improper Legal Opinions.

LST argues that Mr. Pearce offers improper legal opinions on: (1) the meaning of trade secret laws; (2) whether something is a trade secret; and (3) the parties' contracts. ECF No. 365, LST's Memorandum in Support of Motion to Exclude Expert Testimony of Jonathan Pearce ("LST Memo"), at 3. LST's argument both misrepresents the contents of Mr. Pearce's reports and his opinions, and is substantively wrong on the law.

### A. Mr. Pearce Is Not Opining on the Meaning of the Trade Secret Laws.

First, Mr. Pearce does not "opine on" the provisions of the DTSA or MUTSA; rather, he merely recites the statutes in his initial report, providing general background in connection with LST's claims and Mercy and Myia's alleged conduct with regard to the same. *See* ECF No. 367-1, Pearce Report, ¶¶ 18-26. Lest there be any doubt, Mr. Pearce included the provisions as the first subsection of the "Background" portion of his initial report, which is distinct and separate from the section containing his opinions (conspicuously titled, "Opinions"). *Id.* Mr. Pearce will not be testifying regarding the meaning of the statutes; there is nothing to exclude.

### B. Mr. Pearce is Permitted to Testify Regarding Underlying Facts and Analysis To Aid the Court and Jury in Assessing Whether LST's Claimed Features Constitute Trade Secrets or Confidential Information.

With respect to "whether something qualifies as a trade secret," LST and Mercy appear to agree that no expert should offer an opinion containing that ultimate legal conclusion (*e.g.*, "Feature X is/is not a trade secret."). As Defendants state in their motion to exclude the

testimony of LST's technical expert, Brad Ulrich, "expert testimony on legal matters is not admissible." ECF No. 353-1 (citing *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003)).

That said, experts *are* permitted to opine on facts and analysis that may inform these legal matters. Even the cases cited by LST make this distinction clear. *See, e.g.,* ECF No. 365, LST Memo at 4-5 (citing *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82-CRS, 2019 WL 1435934, at *4 (W.D. Ky. Mar. 29, 2019)). In *Caudill*, the court held that an expert cannot opine "that an item is or is not a 'trade secret,'" explaining that "exclusion is proper when an opinion tracks almost verbatim the language of the applicable statute or utilizes a term that has a specialized meaning in the law and in lay use the term has a distinctly less precise meaning." 2019 WL 1435934, at *3 (internal citations and quotation marks omitted). But in the very next paragraph, the court continues, "an expert <u>**may**</u> provide facts and analysis which lead the jury toward that conclusion." *Id.* at *4 (citing cases permitting expert opinion on: "subsidiary issues"; whether information "was in the public domain"; "what information was generally available in the [industry]"; and "whether certain matters are generally known or readily ascertainable") (emphasis added). As another court put it, "while the Court finds that [Expert] cannot use legal terminology, a more carefully phrased question could . . . elicit[ ] similar information and avoid[ ] the problem of testimony containing a legal conclusion." *Univ. of Tennessee Rsch. Found. v. Caelum Biosciences, Inc.*, No. 3:19-CV-508-CEA-DCP, 2024 WL 3266602, at *6 (E.D. Tenn. July 1, 2024) (internal citations and quotation marks omitted).

Just as in *Caudill* and *University of Tennessee,* courts routinely hold that experts are permitted to opine on the facts and analysis underlying the trade secret analysis. *See, e.g., Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, No. 08-0840-CV-W-ODS, 2012 WL

3047308, at *7 (W.D. Mo. July 25, 2012) ("[E]xpert testimony about the types of information that are generally and freely available in the industry will help the factfinder determine whether Plaintiff's information had 'independent economic value' . . . .'"); *Iofina, Inc., Iofina Res., Inc., & Iofina Chem., Inc. v. Igor Khalev, & Kiva Holding, Inc., No.*, CIV-14-1328-M, 2016 WL 6246730, at *3 (W.D. Okla. Oct. 25, 2016) (permitting testimony by expert as to whether certain things are generally known or readily ascertainable by others in the trade, "based on his extensive experience in the [relevant] industry and his review of applicable literature, plaintiffs' documents, and plaintiffs' corporate representatives' deposition testimony . . . ."); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 376 (S.D.N.Y. 2023) (holding that testimony regarding the reasonableness of plaintiff's measures to maintain information as secret is "the permissible subject of expert testimony").

To the extent LST's motion is limited to precluding conclusory testimony on whether something is a "trade secret," Mercy agrees that neither Mr. Pearce nor any other expert should be permitted to provide such testimony. As to his opinions on the underlying issues that inform whether any of the alleged "secrets" are and/or were secret, Mr. Pearce is absolutely permitted and qualified to provide such testimony and LST has neither challenged his qualifications to do so nor cited any authority supporting the exclusion of such testimony.

**C. Mr. Pearce Is Permitted to Opine on the Contracts at Issue in the Case.**

LST seeks to exclude Mr. Pearce's testimony regarding the Mercy/LST Agreements. Again, the very cases LST cites undermine its own position. While an expert may not generally opine on the meaning of a contract, he or she may do so if there is a "need to clarify or define terms of art, science, or trade." *Jackson v. Mizuho Orthopedic Sys., Inc.*, No. 11-00799-CV-W-GAF, 2012 WL 13028557, at *3 (W.D. Mo. Aug. 22, 2012) (quoting *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997)). Another court also clearly drew the distinction:

> Johnson is free to testify as to what a reasonable party would have agreed to, based on his own experience, and what specific terms may mean, if they are too complicated for a jury and would benefit from his experience in the market. He may not, however, testify about what [the parties] subjectively believed the contract to mean, or about what the contract objectively required, both of which are inappropriate topics for expert testimony.

*In re Intuniv Antitrust Litig.*, No. 1:16-CV-12396-ADB, 2020 WL 5995326, at *25 (D. Mass. Oct. 9, 2020). *See also Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (permitting expert testimony on contract provisions that have a specialized meaning).

Opining on specialized industry terms is precisely what Mr. Pearce has done in the vast majority of paragraphs cited by LST. *See* ECF No. 365, LST Memo, at 5 (citing ECF Nos. 367-1, Pearce Report; 367-2, Supp. Pearce Report). More specifically, for example, Mr. Pearce opines on the meaning of the following terms appearing in the PMSA: content, clinical triage algorithms, decision support methods, data presentation methods, clinical data collected, clinical workflow processes, branding, and messaging. ECF No. 367-1, Pearce Report, ¶ 71. Most of the remaining paragraphs cited by LST simply refer back to/incorporate these definitions. *Id.* at ¶¶ 89-90, 92, 113, 115, 128-29, 140, 143-45, 155-56, 173, 176-77, 197-99, 271, 275; ECF No. 367-2, Supp. Pearce Report, ¶¶ 71, 98, 144, 158, 193. LST states that this testimony is improper because the contract is unambiguous. But this issue has not been determined yet. Mercy indeed believes that the terms are unambiguous and encompass the very information LST alleges to comprise its purported "secrets." However, LST has not conceded and disputes the meaning and scope of those terms. In the event that the Court determines that the disputed terms are in fact ambiguous and/or of a specialized nature outside the jury's reasonable understanding, Mr. Pearce's testimony on this issue is entirely proper.

LST argues that Mr. Pearce's opinion nonetheless should be excluded because: (i) he doesn't call the terms "terms of art"; (ii) does not provide "industry standard meanings"; and (iii)

"takes a contractual definition . . . and turns it into 'layman's terms.'" ECF No. 365, LST Memo, at 6. First, LST fails to cite a single case supporting its proposition that an expert must use the magic words "term of art" in order to opine on a definition; there is no such requirement. Second, Mr. Pearce offers his understanding of these specialized terms based on his extensive experience in the telehealth industry. *See, e.g.*, ECF No. 367-1, Pearce Report, ¶ 15. Opining on what those in the industry would understand these terms to mean, and converting them to "layman's terms," is the very purpose of expert testimony. *See In re Intuniv Antitrust Litig.*, 2020 WL 5995326, at *25 ("Johnson is free to testify as to what a reasonable party would have agreed to, based on his own experience, and what specific terms may mean, if they are too complicated for a jury and would benefit from his experience in the market.").

Additionally, many of the paragraphs LST cites do not contain opinions by Mr. Pearce at all, but rather summarize the contracts and their terms as part of the background for his actual opinions. *See, e.g.*, ECF 367-1, ¶ 59 (summarizing key terms from SaaS); *id.* at ¶¶ 60, 62-65, 68-69. Mr. Pearce is allowed to testify regarding facts underlying his opinions and any objections to such testimony are "at best premature." *See McCoy v. DePuy Orthopaedics, Inc.*, No. 22-CV-2075 JLS (SBC), 2024 WL 1705952, at *20 (S.D. Cal. Apr. 19, 2024) ("Dr. Kessler may testify regarding the facts he relied upon in forming his opinions if such facts are relevant, are not cumulative, and do not constitute a mere rehashing of otherwise admissible evidence, *id.*, and any specific objections to narrative testimony must wait for trial.").

## II. <u>Mr. Pearce Is Permitted to Testify Regarding Industry Standards.</u>

Seeking to avoid entirely appropriate expert testimony, LST argues that Mr. Pearce should not be permitted to opine as to what features were "standard" in the industry. *See* ECF No. 365, LST Memo, at 7-9. LST claims that Mr. Pearce "offers no evidence, supporting authority, or corroborating source" to support his opinion, relying solely on his own industry

experience. *Id.* at 8. This is false. Mr. Pearce relies on his own experience, review and analysis of the record evidence, as well as his research and analysis of other RPM platforms to support his opinions. *See, e.g.,* ECF No. 367-1, Pearce Report, ¶ 15; ECF No. 367-3, Excerpts from Pearce Dep. Tr. ("Pearce Dep."), 103:22-104:14. Mr. Pearce provided over 130 pages in support of his opinions in this case; LST's motion attempts to excise portions of his reports by improperly considering specific lines or paragraphs in isolation, divorced from the context of the rest of his reports. This is entirely improper. *ABS Glob., Inc. v. Inguran, LLC,* No. 14-CV-503-WMC, 2019 WL 3812520, at *21-22 (W.D. Wis. Aug. 14, 2019) (denying *Daubert* motion after considering the expert's "entire report, and not just those discrete paragraphs highlighted by [movant]").

Mr. Pearce's opinions regarding industry standards and expectations are common and entirely appropriate. *See, e.g.*, *Novartis Pharma AG v. Incyte Corp.*, No. 1:20-CV-400-GHW, 2024 WL 3608338, at *11 (S.D.N.Y. July 29, 2024) ("[T]o the extent that [an expert] opines on what is consistent with or typical of industry practices or customers, such opinions may reliably assist the trier of fact."); *United States v. Empire Bulkers, Ltd.*, No. CR 21-126, 2022 WL 1811158, at *4 (E.D. La. June 2, 2022) ("[Expert] may testify, to the extent that he can within his expertise, as to relevant industry standards and expectations.").

Despite its protestations, LST's own technical expert, Mr. Ulrich, opined that LST's alleged secrets were not generally known or readily ascertainable by others in the industry. LST's damages expert, Mr. Duncan, opined that but-for the alleged misappropriation, LST would have had increased profits. The contracts in this case contain the standard carve-outs for "Confidential Information," including that which is otherwise known to the general public. Mr. Pearce's testimony that the very information and features LST alleges to constitute its "secrets" were standard and expected by customers in the industry is both well within his field of expertise

and perfectly appropriate and permissible. This is precisely what LST is seeking to exclude. *E.g.*, ECF No. 365, LST Memo at 7 (*quoting* ECF No. 367-1, Pearce Report, ¶ 76 ("I identify below functional elements of an RPM platform . . . . For the avoidance of doubt, a platform that lacked these features would struggle to be commercialized as an RPM system . . . .").

After describing, in detail, his significant experience in telehealth (including designing and managing telehealth platforms), Mr. Pearce plainly explains the basis for his opinions:

> 15. Based upon my extensive knowledge and years of experience in this field, I am extremely knowledgeable about, among other things, remote patient management software and how such software, services, and products, have been designed, developed, implemented, and used during the relevant time periods (*i.e.*, what I understand to be approximately 2015 – 2021). My analysis and opinions in this matter are based on my personal experience and what was known and readily ascertainable to people in the field during the relevant time periods.

ECF No. 367-1, ¶ 15. *See also id.* at ¶¶ 3-14 (detailing Mr. Pearce's experience and qualifications). The remainder of his report provides numerous specific examples of third-party platforms, identifying in each the very features he identifies as "standard", "known", "readily ascertainable", and the like. *Id.* at ¶¶ 41-49, 99-101, 123, 126, 131, 144, 147, 160-64, 180-82, 185-86, 200, 202, 204; ECF No. 267-2, Supp. Pearce Report, ¶¶ 22-29, 32-34.

LST attempts to discount Mr. Pearce's reliance on other known products and systems because Mr. Pearce testified that he did not know, at the time of his deposition, whether other platforms implemented features "in the same way" as LST. ECF No. 365, LST Memo, at 9. But neither LST's Trade Secrets Disclosure nor the report of its technical expert, Brad Ulrich, identify any particular "way" LST allegedly implements any alleged features (nor could they; even assuming, *arguendo*, LST has any protectable secrets, its own expert admitted that he did not have "the trade secret itself," "the thing that took so long to build," until he had LST's source code). Excerpts from May 29, 2024 Ulrich Dep. Tr. ("May 29, 2024 Ulrich Dep."), 123:18-124:3. Instead, LST has claimed the mere presence of the features as its alleged secrets. *See, e.g.*,

ECF No. 353-8, Ulrich Supp. Report, at Table 2 (identifying every alleged secret as the "ability to" perform certain functions). Mr. Pearce's opinions as to the knowledge and presence of these features in other platforms is extremely relevant and appropriate. Any argument LST has against this testimony goes to weight, not admissibility, and can be addressed on cross-examination.

## III. Mr. Pearce's Opinions Regarding the Prior Vivify Products and Patents are Appropriate and Reliable.

Mr. Pearce opines that the Vivify platform (and corresponding published patents) "was significantly more sophisticated and encompassed all but perhaps one of the principal features that Mr. Ulrich, and LST, contend to comprise LST's alleged trade secrets." ECF No. 367-1, Pearce Report, ¶ 41. Mr. Pearce relies on his own independent familiarity with Vivify, a Vivify PowerPoint presentation, and several Vivify patents, in proper support of his opinions. LST moves to exclude these opinions—no doubt because they are extremely damaging to LST's case.

LST argues that Mr. Pearce never "reviewed or saw the software other than seeing some portions of the operating version at trade shows," "does not have specialized knowledge on the substance of Vivify's software," and merely recites what is in certain evidence (namely, a Vivify PowerPoint presentation detailing Vivify's RPM platform). ECF No. 365, LST Memo at 9-10. LST's characterizations are completely inaccurate. First, Mr. Pearce expressly states in his report that he "was personally familiar with Vivify's product during the relevant time frame," ECF No. 367-1, Pearce Report, ¶ 39, and testified during his deposition that he has "seen the Vivify RPM system," "Vivify was very active in trade shows and the telemedicine space," and he "had a number of opportunities to look at the software in publicly available settings." ECF No. 367-3, Pearce Dep., 92:16-24. LST's challenge to Mr. Pearce's personal knowledge is unfounded.

Moreover, Mr. Pearce is not merely repeating facts "that can be gleaned from documents themselves"; rather, he is providing expert opinions as to what the documents disclose and mean.

ECF No. 365, LST Memo, at 10. The only case LST cites on this point concerns a "slip-and-fall" case where the court excludes an expert's testimony that merely stated whether a video recording did or did not show a certain event occurring. *Id.* (citing *Mann v. QuikTrip Corp.*, No. 4:22-CV-01060-JAR, 2023 WL 9023262, at *3 (E.D. Mo. Dec. 29, 2023)). That is in stark contrast to Mr. Pearce's opinions. Mr. Pearce is not simply opining on whether the Vivify documents disclose a Vivify system. Rather, he is combining his personal knowledge, expertise, and the information disclosed in the documents, to opine on what the Vivify presentation and documents reveal to a person in the industry regarding whether certain features and functionality were generally known and/or readily ascertainable. ECF No. 267-1, Pearce Report, ¶¶ 39-49, 185, 204; ECF No. 267-2, Supp. Pearce Report, ¶¶ 22-29, 88-89, 102, 142-43.

Cases actually dealing with trade secret claims make clear that this exact type of expert testimony is appropriate. *See, e.g.*, *Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 418 (N.D. Cal. 1999) (permitting expert to opine as to whether the alleged trade secrets were generally known based on research they did to identify relevant published materials); *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-CV-00341-SEB-DM, 2009 WL 3187727, at *2 (S.D. Ind. Sept. 30, 2009) (permitting an expert to testify regarding what was generally known in the industry based on internet searches for relevant materials, combined with "his significant knowledge and experience"); *Segerdahl Corp. v. Ferruzza*, No. 17-CV-3015, 2023 WL 2161774, at *4 (N.D. Ill. Feb. 22, 2023) ("Experts may utilize their experience in a particular field as the basis for their opinions, not just surveys and methodological research.").

LST also seeks to exclude Mr. Pearce's opinions regarding several published Vivify patents. As a preliminary matter, it is unclear whether LST is seeking to exclude Mr. Pearce's testimony regarding all six Vivify patents identified in his report, or only five of the six. *See* ECF

No. 365, LST Memo at 10 ("Mr. Pearce could not identify where, in five of the Vivify patents he relies on, LST trade secrets were allegedly disclosed."). With respect to U.S. Patent No. 9,619,849, LST does not dispute that Mr. Pearce provided numerous citations throughout his reports identifying what is disclosed in the '849 Patent and mapping specific parts of the patent to the various features LST is claiming as its alleged secrets. *See* ECF No. 367-1, Pearce Report, ¶ 42; ECF No. 367-2, Supp. Pearce Report, ¶¶ 25-27, 29, 36, 89, 102, 142-43, 154. Tellingly, LST's counsel did not ask Mr. Pearce about any of these citations during his entire deposition, or about the disclosures in the '849 Patent generally (except, as discussed below, only in comparison to the other five patents). There is simply no basis to exclude Mr. Pearce's opinions relating to Vivify's '849 Patent as evidence of what was generally known in the industry.

LST's remaining attacks upon Mr. Pearce's opinions regarding Vivify's published patents are equally unavailing. First, LST criticizes Mr. Pearce's "lack of knowledge regarding . . . patents generally," such as his lack of knowledge as to "what a patent specification is." ECF No. 365, LST Memo, at 10. Mr. Pearce does not hold himself out as a patent attorney or patent expert, and detailed knowledge regarding patent law is completely irrelevant. Mercy is not offering Mr. Pearce as a patent expert, and he is not offering any opinions on patent validity or infringement (such issues are not in the case). Mr. Pearce is opining on what the Vivify patents disclose and whether the disclosures comprise the same features that LST claims as its alleged secrets. Whether he knows a patent specification from a patent claim, or invalidity from unenforceability, or any other patent-specific issue, has absolutely nothing to do with whether he can read a patent, understand its disclosure, and opine on the features. The Vivify patents are functionally no different than any other document Mr. Pearce analyzed in order to opine on what was generally known and in use in the industry and other RPM platforms at the relevant times.

With respect to the other five Vivify patents, LST argues that Mr. Pearce "could not explain the differences among the patents" and "could not identify where . . . LST trade secrets were allegedly disclosed." ECF No. 365, LST Memo, at 10. This is simply not true. At his deposition, LST's counsel asked Mr. Pearce to identify the differences between the '849 Patent and each of the other five Vivify patents. *See generally* ECF No. 367-3, Pearce Dep., 96:16-122:22. Mr. Pearce properly responded that he had not performed that analysis comparing each of the patents, and that he could do so, but he would need time to make the comparisons. *Id.* at 99:4-100:14; 108:1-17; 122:19-22. Similarly, when asked to show where, for example, U.S. Patent No. 9,357,238 disclosed LST's alleged trade secrets, Mr. Pearce explained that he would need to "go back through [the] '238 [Patent] and start to create a little bit more of a mapping here." Exhibit 1, Add'l Excerpts from Pearce Dep. Tr., at 118:20-24. LST's counsel did not ask Mr. Pearce to do so. While Mr. Pearce was prepared to testify regarding his analysis and opinions regarding Vivify's '849 Patent—which was extensively addressed in his reports—LST conspicuously elected not to ask him any questions regarding that patent. The five other Vivify patents comprise over 200 pages. Exhibit 2, Vivify Patents. Mr. Pearce's "inability" to provide detailed responses regarding those patents without being provided the time to review the documents, as he requested, is no basis to exclude his well-founded analyses and opinions.

LST also contorts Mr. Pearce's testimony to contend that he testified that the Vivify patent is "nothing like" LST's software. ECF No. 365, LST Memo, at 11. That is a blatant mischaracterization. LST's counsel asked Mr. Pearce, "Do you hold the opinion that someone who read this ['849] patent from front to back . . . would be able to go create software that replicates the portions of the software LST claims as its trade secrets?" ECF No. 367-3, Pearce Dep., at 190:22-191:2. Mr. Pearce explained over the course of five paragraphs (from which LST

cherry-picks) that because LST's software originated as a research platform, not an RPM tool, it had to be adapted to serve as an RPM, resulting in a clunky, inefficient program that fails to meet the sophistication of the "really good patent for RPM" reflected in the '849 Patent.[1] *Id.* at 191:6-192:18. In other words, he highlighted the inadequacies of LST's software compared to what was available, generally known, and readily ascertainable in the industry. He did not testify that the Vivify '849 Patent does not disclose the alleged features and functions constituting LST's alleged "secrets," nor did he state that there is no probative value in comparing the alleged secrets to what was generally known and disclosed in the '849 Patent.

LST's manufactured issues regarding Mr. Pearce's opinions provide no legitimate basis for exclusion. Mr. Pearce's opinions are proper and LST's motion should be denied.

## IV. LST's Flawed Arguments Regarding Opinions on Motivation and State of Mind.

Finally, LST argues that Mr. Pearce provides improper opinions "regarding motivations and states of mind." ECF No. 365, LST Memo, at 11. This, too, mischaracterizes Mr. Pearce's actual opinions and is wrong.

First, most of the paragraphs LST cites in support of its argument merely contain a summary of facts that Mr. Pearce provided as background context for his opinions. *See* ECF No. 365, LST Memo, at 12 (citing ECF No. 367-1, Pearce Report, ¶¶ 35, 38, 50-57, 61, 66-67, 70, 270-71, 281). Paragraphs 50-57, 61, and 66-67 are all part of the "Background" section of Mr. Pearce's report. A few representative examples reflect that the background information contains no "improper" opinions regarding motivations and intent:

[1] This mirrors a point Mr. Pearce made repeatedly throughout his reports; namely, that the features in LST's software were simplistic, dated, and he would not expect to see LST's specific implementation of these features repeated in (or copied by) others in the industry. *See, e.g.*, ECF No. 367-1, Pearce Report, ¶ 102 ("LST's software was not purpose-built for RPM usage; rather, its foundation was designed for a different purpose . . . This fact, along with LST's lack of expertise, resulted in the LST m.Care product lacking a robust framework architecture . . . .").

> 52. I understand that in 2014, Mercy broke ground on a new 120,000 square-foot Virtual Care Center that was dedicated to providing remote monitoring and telemedicine services.

> 54. To facilitate selection of a potential third-party to assist with Mercy's customized development, Mercy issued a Request for Information ("RFI")[30] to nine companies which included, among others, Epic, Philips, Go Telcare, AMC, LST, Cario, and American Telecare. Two potential candidates did not respond to Mercy's RFI and a third, American Telecare, did not provide its answers in a proper format.[31]

> 67. Mercy entered into an agreement with Myia in July, 2019.[45] Mercy also made a capital/equity investment in Myia around such time, in the amount of $5M, which investment was publicly reported and picked up by the press in September, 2019.[46]

ECF No. 367-1, Pearce Report, ¶¶ 52, 54, 67. There is nothing improper about Mr. Pearce providing such facts. *See United States v. Tartaglione*, 815 F. App'x 648, 651 (3d Cir. 2020) (holding that experts can provide background testimony to contextualize relevant facts). Moreover, the appropriate time to challenge such testimony is at trial. *See McCoy*, 2024 WL 1705952, at *20. To the extent LST claims there is something more specific in the cited paragraphs that is allegedly improper, it has not adequately identified any such issues.

As discussed above, Mr. Pearce is also permitted to testify regarding industry standards and expectations. *See, e.g.*, *Novartis Pharma AG*, 2024 WL 3608338, at *11 ("[T]o the extent that [an expert] opines on what is consistent with or typical of industry practices or customers, such opinions may reliably assist the trier of fact."); *Empire Bulkers, Ltd.*, 2022 WL 1811158, at *4 ("[Expert] may testify, to the extent that he can within his expertise, as to relevant industry standards and expectations."). *See also In re Intuniv Antitrust Litig.*, 2020 WL 5995326, at *25 ("Johnson is free to testify as to what a reasonable party would have agreed to, based on his own experience . . . ."). Mercy agrees that experts may not testify on the parties' actual intentions, but it is absolutely proper and within Mr. Pearce's expertise to opine on what was known and

standard in the industry, as well as what a reasonable party would have expected or agreed to. Mr. Pearce's opinions regarding how LST's product stacked up against others in the industry and whether a reasonable party would have sought to use or copy LST's product are well within his field of expertise and proper expert testimony. *See*, *e.g.*, ECF No. 367-1, Pearce Report, ¶ 269.

The same is true with respect to Mr. Pearce's opinions regarding the inability of LST's software to meet Mercy's needs. In an interrogatory response, Mercy identified inadequacies with LST's product that played a part in Mercy's decision to switch to Myia. ECF No. 377-17, Mercy's Responses to LST's 1st Interrogatories, at 19-23. LST's expert, Mr. Ulrich, first tried to address Mercy's state of mind regarding the "adequacy" of LST's software in his supplemental report. ECF No. 353-8, Supp. Report of Brad Ulrich, ¶ 83 ("Below I review each claim and provide a detailed analysis indicating how LST actually satisfied the features Mercy claimed to be lacking."). In response, Mr. Pearce reviewed Mercy's interrogatory response and the LST software, and opined as to whether the features Mercy claimed to be lacking were in fact present in the LST software. ECF No. 367-2, Supp. Pearce Report, ¶¶ 160-178. LST does not appear to be seeking to exclude the entirety of this opinion, but identifies three paragraphs—165, 166 and 175— that it claims contain improper speculation on "state of mind." ECF No. 365 at 12. This grossly misrepresents these paragraphs. Paragraph 165 merely makes the abstract, tautological point that if a customer is unhappy, the product is not, by definition, meeting the customer's needs. *Id.* at ¶ 165. Paragraph 166 contains Mr. Pearce's opinion that it would not make sense to copy a product with which a customer is dissatisfied. *Id.* at ¶ 166. And paragraph 175 cites statements by LST's own chief developer confirming that LST's software functioned in exactly the way Mercy deemed inadequate. *Id.* at ¶ 175. There is simply no "state of mind" testimony in any of these, or any other, paragraphs identified by LST. Its motion should be denied.

Respectfully submitted,

Dated: August 26, 2024

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: /s/ *Jason S. Meyer*

David A. Roodman, #38109 MO
Mark S. Deiermann, #31521 MO
Jason Meyer, #64030 MO
Craig O'Dear, #30167 MO
Nick E. Williamson, #56925MO
Jennifer A. Goltermann, #60835MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
daroodman@bclplaw.com
msdeiermann@bclplaw.com
jason.meyer@bclplaw.com
csodear@bclplaw.com
nick.williamson@bclplaw.com
jenny.goltermann@bclplaw.com

*ATTORNEYS FOR MERCY DEFENDANTS*